UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| JENNIFER TJULANDER, ) | Case No: 3:24-cv-00123 |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | COMPLAINT |
| ) | Employment Discrimination |
| THE OFFICE OF REPRESENTATIVE ) | (2 U.S.C. §§ 1301, et seq.) |
| LORI CHAVEZ-DEREMER, ) | |
| U.S. House of Representatives, ) | DEMAND FOR JURY TRIAL |
| ) | |
| Defendant. ) | |

## COMPLAINT

Plaintiff, Jennifer Tjulander, by and through her undersigned counsel, hereby states her

Complaint against Defendant, The Office of Representative Lori Chavez-DeRemer, U.S. House

of Representatives, Oregon, 5th District.

## I.    JURISDICTION

1.    Plaintiff invokes the jurisdiction of this Court pursuant to the Congressional

Accountability Act of 1995 (2 U.S.C. §1408 (a)), 28 U.S.C. § 1331 (Federal Question), and 28

U.S.C. § 1343.

2.    This is an action authorized and instituted pursuant to the Congressional Accountability

Act (2 U.S.C. § 1301 et seq.).

3.    The unlawful employment practices alleged in this Complaint were committed in the

State of Oregon.

4.      Before filing this action, Plaintiff administratively exhausted her claims by filing an administrative complaint on September 19, 2023, with the Office of Congressional Workplace Rights ("OCWR") (case number 23-HS-39 (DA, RP)).

5.      The OCWR Complaint was filed within 180 days from the date Defendant terminated Plaintiff, as required by 2 U.S.C. § 1402(d). Plaintiff has the right to file this civil action, pursuant to 2 U.S.C. §§ 1401 and 1408 because she has not submitted a request for a hearing with OCWR with respect to this claim (2 U.S.C. § 1401(b)(1)), and this civil action is filed within 70 days of the date Plaintiff filed her OCWR claim, as required by 2 U.S.C. § 1401(d).

6.      Pursuant to §4.05(b)(1) of the Procedural Rules of the Office of Congressional Workplace Rights, the time limit to file a civil action is tolled as a result of the parties engaging in mediation prior to the conclusion of the 70-day period. Plaintiff's administrative claim was mediated with Defendant from October 26, 2023 until December 26, 2023.

7.      Venue is appropriate in the District of Oregon pursuant to 28 U.S.C. § 1391(b) because the claim arose in this Judicial District.

8.      Divisional venue pursuant to Local Rule 3-2 lies within Division 3, Portland Division, because a substantial part of the events or omissions giving rise to the claim occurred within Clackamas County, Oregon.

## II.    PARTIES

9.      Plaintiff, Jennifer Tjulander, is a resident of the State of Oregon.

10.     Ms. Tjulander is a former employee of the U.S. House of Representatives, and thus, she is a "covered employee" pursuant to the Congressional Accountability Act ("CAA") (2 U.S.C. § 1301(a)(3)(A)).

11.     From January 3, 2023, through May 15, 2023, Ms. Tjulander was employed by the Office

of Representative Lori Chavez-DeRemer as a Caseworker in the Oregon City, Oregon District

Office.

12.     Defendant, The Office of Representative Lori Chavez-DeRemer, maintains a principal

office in 1722 Longworth House Office Building in Washington, D.C. and a district office at 621

High Street, Oregon City, OR 97045.

13.     Defendant is an "Employing Office" of the U.S. House of Representatives, pursuant to

the CAA (2 U.S.C. § 1301(a)(9)(A)).

14.     At all times relevant, Defendant's employees and supervisors, as their conduct is alleged

herein were acting within the course and scope of their employment with Defendant and were

under the supervision and control of the employing office.  Those employees and supervisors

include the following: Representative Lori Chavez-DeRemer; Rebecca Wright, District Director;

Alex Lopez, Deputy District Director; and, Jihun Han, Chief of Staff.

## III.    GENERAL FACTUAL ALLEGATIONS

### A.    Circumstances Leading to Ms. Tjulander's Employment With the Office

15.     In 2022, the campaign organization that worked to elect now-Representative Lori

Chavez-DeRemer hired Ms. Tjulander to work for the campaign as a Field Organizer.

16.     Alex Lopez, the Political Director of the campaign, hired and supervised Ms. Tjulander

during the campaign.

17.     Jihun Han worked for the campaign as the Campaign Manager, a position in the

campaign superior to that of Mr. Lopez.

3

18.     Ms. Tjulander's stepfather died unexpectedly in October 2022. For a period of ten years, Mr. Tjulander and Ms. Tjulander developed a close familial relationship and she regarded him as the only true father figure in her life.

19.     On January 23, 2023, to honor her stepfather's memory, Plaintiff petitioned the Circuit Court of Multnomah County, Oregon to legally change her name from Jennifer Aarness to Jennifer Tjulander.

20.     Ms. Chavez-DeRemer, Mr. Han, and Mr. Lopez were aware that Ms. Tjulander's stepfather unexpectedly died, and that after his death, Ms. Tjulander was ███████████████

███████████████████████. Ms. Tjulander sought and was granted reasonable accommodations by the campaign.

21.     During the campaign, Mr. Lopez asked Ms. Tjulander what position she would like in Ms. Chavez-DeRemer's congressional office if Ms. Chavez-DeRemer won the election.

22.     Ms. Tjulander replied that she had prior experience as a Legislative Assistant writing a newsletter and handling constituent communications, and that she was interested in a digital communications position with the Congressional office.

23.     On November 8, 2022, Ms. Chavez-DeRemer won the congressional election.

24.     Following the election, Mr. Han, who would become Rep. Chavez-DeRemer's Chief of Staff, and Rebecca Wright, District Director, interviewed Ms. Tjulander for a Field Representative position for the district office. However, after the interview, Defendant instead offered Ms. Tjulander a position as a Caseworker for the district office.

25.     Mr. Han asked Ms. Tjulander if she had any student loan debt and stated that the benefits of the job come with monthly student loan payments. Ms. Tjulander told Mr. Han that she had student loan debt. Mr. Han confirmed that in addition to the Caseworker salary and other

benefits, Ms. Tjulander's compensation would include direct payment of her monthly student loan payments. These payments would be equal to the maximum amount a Congressional office is permitted to provide for student loan repayment once repayment obligations resumed.

26.    Mr. Han told Ms. Tjulander that an advantage of the Caseworker position, compared to a position as a Field Representative, was that a Caseworker position would provide Ms. Tjulander with scheduling flexibility if she wanted to also attend school while working.

27.    Mr. Han did not indicate to Ms. Tjulander that the position required all work to be performed in the Oregon City District Office and that the position was not telework eligible.

28.    Ms. Tjulander negotiated a starting salary of $50,000 per year.

29.    Mr. Han provided Ms. Tjulander with a job description for a Caseworker. As for the key duties of the position, the description states that a Caseworker:

> a.    Serves as a liaison for federal governments for individual constituent concerns;
>
> b.    Maintains constituent casework in assigned areas of expertise;
>
> c.    Monitors and updates the Member and District Director on casework trends;
>
> d.    Prepares and manages incoming and outgoing casework in assigned areas of expertise;
>
> e.    Maintains accurate and complete files on all assigned casework matters; and,
>
> f.    Monitors, screens, and refers cases, when appropriate, to other government entities.

30.    The job description did not include physical presence in the office as an essential function of the position of Caseworker, nor did it, in any other manner, reference any need or requirement to be physically present in the office.

31.    The Office also hired Pamela Thompson as a Caseworker in the District Office.

5

**B.    Ms. Tjulander's Employment with Defendant**

32.    On or about January 3, 2023, Ms. Tjulander began her employment as a Caseworker for Representative Chavez-DeRemer, working in the Oregon City, Oregon District Office.  In January 2023 Defendant issued Ms. Tjulander a laptop and cell phone.

33.    During Ms. Tjulander's employment with Defendant, Rebecca Wright was the District Director in the Oregon City, Oregon district office. Ms. Wright was Ms. Tjulander's immediate supervisor.

34.    Early in Ms. Tjulander's tenure with the Defendant, Ms. Wright confirmed that Defendant would pay Ms. Tjulander's monthly student loan payments directly to her loan provider, in the amount of $833.33 each month. Ms. Wright indicated that the Office would begin doing so if Ms. Tjulander still had student loan debt when repayment obligations resumed.

35.    On or about January 3, 2023, Ms. Thompson began her employment as a Caseworker for Representative Chavez-DeRemer. Ms. Wright was Ms. Thompson's immediate supervisor. From January 3, 2023, through Ms. Tjulander's last day of employment on May 15, 2023, Ms. Thompson worked remotely almost every day.

36.    Upon information and belief, Ms. Thompson had not requested telework as a reasonable accommodation for any disabling medical condition.

37.    On January 11, 2023, Ms. Tjulander filed a sex discrimination claim with the Office of Congressional Workplace Rights (OCWR).  The claim was designated as Case No. 23-HS-01 (CV, FM, FL).

38.    Filing the complaint constituted protected activity under the CAA and Title VII of the Civil Rights Act of 1964.

39.     In the administrative claim, Ms. Tjulander alleged that Defendant discriminated against her based upon sex when it hired Alex Lopez as the Deputy District Director instead of her, even though Ms. Tjulander had more relevant professional experience.  Ms. Tjulander further asserted Defendant discriminated on the basis of her sex when it paid her less than her male colleague and excluded her from attending Representative Chavez-DeRemer's swearing in as a member of the United States House of Representatives.

40.     During a telephone call in January 2023, Ms. Tjulander notified Ms. Wright that she filed a sex discrimination claim with the Office of Congressional Workplace Rights against Defendant.  After being informed of the complaint of sex discrimination, Ms. Wright repeatedly insinuated to Ms. Tjulander that she take a job elsewhere.

41.     Sometime in January 2023, the Defendant formally learned from OCWR that Ms. Tjulander filed the discrimination claim. As dictated by OCWR's procedural rules, the Defendant received a copy of Ms. Tjulander's discrimination claim.

**C.     Ms. Tjulander's Health and Defendant's Disability Violations and Retaliation**

42.     On January 25, 2023, Ms. Tjulander texted Ms. Wright to explain that she would be late coming to the office because she had been ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

43.     Ms. Tjulander suffers from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮ Ms. Tjulander also suffers from ▮▮▮▮▮▮▮▮▮▮▮▮▮    ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is a qualifying disability under the Americans with Disabilities Act of 1990 ("ADA") and the Rehabilitation Act of 1973. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
are also qualifying disabilities under the ADA and the Rehabilitation Act of 1973.

44.     On January 25, 2023, Ms. Tjulander spoke with Ms. Wright about Ms. Tjulander's medical challenges. Ms. Tjulander shared that she had been suffering from ▮▮▮▮▮▮▮▮

7

████████████████████████████████████████████ following the October 2022 death of her stepfather.

45.     Ms. Tjulander also told Ms. Wright that she previously ████████████████████

████████████████████████ Ms. Tjulander informed Ms. Wright that her medical conditions were ongoing.  Ms. Tjulander told Ms. Wright that she had been trying to ██████████

████████████████████████████ but had been told they had no appointments or care providers available, and that she had otherwise been unable to locate medical services.

46.     Ms. Wright recognized and acknowledged Ms. Tjulander's need for medical treatment. Ms. Wright provided contact information to Ms. Tjulander for services offered by the House of Representatives Office of Employee Assistance.

47.     On February 7, 2023, Ms. Tjulander texted Ms. Wright stating that she could not come into the office that day and that she needed to tend to ████████████████████

48.     Ms. Wright acknowledged the email and asked if Ms. Tjulander was up to making work-related telephone calls from home.

49.     Ms. Tjulander responded that she could do work tasks on her cell phone if the Defendant emailed her intake forms.

50.     On February 9, 2023, Ms. Wright emailed Ms. Tjulander acknowledging that Ms. Tjulander had shared her ongoing medical conditions with Ms. Wright.

51.     On February 23 and 24, 2023, due to a snowstorm, Ms. Tjulander could not get to the district office.  On those days, the Office assigned Ms. Tjulander work to do remotely from home.

52.     Defendant learned in February 2023 that Ms. Tjulander was able to complete her casework duties without issue via telework. Ms. Wright knew that Ms. Tjulander fulfilled her duties successfully via telework on February 23 and 24, 2023.

53.     On March 3, 2023, Ms. Tjulander again informed Ms. Wright that her medical impairment was affecting her ability to perform her job duties in person. In a text message to Ms. Wright in the morning of March 3, 2023, Ms. Tjulander wrote that she ███████████████

███████████████████████████████████████████████

███████████████ and that her intake meeting with a medical care provider had been postponed another two weeks. Ms. Tjulander said she could join the weekly caseworker meeting by phone and could work on cases from home but did not have her work equipment.

54.     Between March 3, 2023, and March 14, 2023, Ms. Wright instructed Ms. Tjulander to take her work equipment (*i.e.*, the Office-issued laptop and cellphone) home every day so that she could work from home in case of unplanned absences. Ms. Wright cited Ms. Tjulander's latest absence (March 3, 2023) as a day she "could have worked a half day from home if [she] had [her] work equipment with [her]."

55.     On March 14, 2023, during a day Ms. Wright was away on business with the Congresswoman, Ms. Tjulander noticed that there were two cases involving constituents who needed their passports within one week sitting for assignment in Indigov, the Office's internal case matter software. Because these were urgent matters, Ms. Tjulander took on those assignments and assisted the two constituents.

56.     Ms. Tjulander expected Ms. Wright to be pleased that Ms. Tjulander had shown that initiative to assist constituents in need.

57.    Instead, Ms. Wright told Ms. Tjulander that she should have waited for Ms. Wright to assign those case matters.

58.    On March 15, 2023, Ms. Tjulander attended mediation with Jihun Han and Rebecca Wright on Ms. Tjulander's then-pending OCWR claim of sex discrimination. Mr. Han and Ms. Wright were represented by attorneys from the Office of House Employment Counsel (OHEC), Ms. Tjulander was not represented by counsel. The mediation was unsuccessful.

59.    Shortly after the March 15, 2023 unsuccessful mediation, Ms. Wright criticized and scolded Ms. Tjulander's supposedly insufficient attendance in-person at the office location. Peyton Smith, Congresswoman Chavez-DeRemer's Scheduler, was also present via FaceTime for the meeting.

60.    During the meeting, Ms. Wright did not acknowledge Ms. Tjulander's health conditions despite the fact that Ms. Wright was aware that Ms. Tjulander was suffering from ▮▮▮▮▮▮▮ ▮▮▮▮▮▮ that affected her attendance. Ms. Tjulander did not raise her disabilities and the Defendant's lack of providing her a reasonable accommodation during this meeting as Ms. Tjulander did not want to disclose her confidential medical information to Ms. Smith.

61.    On March 24, 2023, Ms. Tjulander requested a reasonable accommodation that would have allowed Ms. Tjulander to perform the essential functions of her job. Specifically, Ms. Tjulander texted Ms. Wright stating that she had ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ and asked if she could work from home that day. She told Ms. Wright that she was able to log into the Office's VPN network via her Office-issued cell phone and laptop, which she had with her at home pursuant to the instruction from Ms. Wright that Ms. Tjulander bring home that equipment so that she could work from home.

10

62.    Ms. Wright refused to accommodate Ms. Tjulander's health condition. Ms. Wright

responded to Ms. Tjulander by text message, stating:

> "You are not approved to telework unless the office asks it of you, i.e.: inclement
> weather, construction, etc. If you are well enough to work a half day from home,
> then I would expect you are well enough to work a half day from the office. If you
> can make it to the office by 2:00, then we will count it as a half day. If you can't
> make it in, then we will count today as a full day of leave. We will discuss all of
> the other items you listed on Monday afternoon."

63.    Ms. Tjulander was confused by Ms. Wright's March 24 response because Ms. Wright

previously instructed Ms. Tjulander that she should take her office equipment home in order to

telework in these circumstances. Ms. Tjulander inquired of Ms. Wright:

> "I'm confused. I thought the whole point of taking the devices home were in case
> of events or absences. When you asked me to start taking my devices home, you
> mentioned inclement weather, yes, but also stated "if you had your devices and
> wanted to work a half day you could have" referring to my last absence when I said
> I would be fine with joining the meeting or working a half day. I'm not approved
> to join the meeting by phone?"

Ms. Tjulander also stated that she was suffering from ▮▮▮▮▮▮▮▮▮▮▮▮▮

64.    Defendant did not engage with Ms. Tjulander in an interactive discussion to determine

whether Ms. Tjulander could telework as an accommodation for her medical conditions.

65.    Defendant was imposing a different standard upon Ms. Tjulander than other similarly

situated employees. The other Caseworker, Ms. Thompson, joined the weekly Caseworker

meeting by telephone every week, including the meeting held on March 24, 2023.

66.    Because Ms. Thompson joined the Caseworker meeting by telephone every week, this

weekly meeting was also referred to as the weekly "caseworker call."

67.    Ms. Wright's refusal to allow Ms. Tjulander to work at home was a reversal in attitude

and instruction from Ms. Wright's previous acknowledgement that Ms. Tjulander could work

from home with the proper equipment. This reversal of attitude and instruction followed within

11

days of Ms. Tjulander's decision to not accept Defendant's offer of settlement of her sex discrimination claims during mediation.

68.     Prohibiting Ms. Tjulander from working from home in these circumstances was a retaliatory action taken by the Office because Ms. Tjulander rejected the Office's offer to settle her then-pending OCWR claim.

69.     Prohibiting Ms. Tjulander from working from home in these circumstances also constituted disability discrimination.

70.     On March 27, 2023, Ms. Tjulander sent an email to Ms. Wright indicating that she understood that she was protected by the ADA and asked whether Defendant had forms necessary for her to complete to receive accommodations.

71.     Ms. Tjulander specifically stated in her March 27 email that because she ██████████

██████████ "I am covered under the ADA to have workplace accommodations." Ms. Tjulander further indicated that because of her medical conditions she found it difficult to maintain in-person workplace attendance and had used many sick and vacation days to address her health. Ms. Tjulander further expressed that Defendant should be assisting with identifying and providing reasonable accommodation.

72.     On March 28, 2023, Ms. Wright responded to Ms. Tjulander's email as follows, "We have received your accommodations request and will be in touch with next steps soon. In the meantime, please let us know if there is anything you need."

73.     On March 29, 2023, Ms. Wright emailed Ms. Tjulander stating, "Can you please clarify what workplace accommodation you are asking for specifically? This is the first time you have ever mentioned an ADA accommodation and I will need that information so that I can find answers to your questions and ensure I send you the proper forms, which your medical provider

12

will have to complete." Ms. Wright then informed Ms. Tjulander that she had a negative leave balance.

74.     Ms. Wright's statement that Ms. Tjulander's March 27, 2023, email was the first time that Ms. Tjulander raised her medical condition and the need for an accommodation was false.

75.     On April 4, 2023, Ms. Tjulander sent a detailed email to Ms. Wright describing the history of her disclosures to Defendant regarding her health conditions and requests for workplace adjustments to accommodate her serious health conditions.

76.     Ms. Tjulander's email described her ▮▮▮▮▮▮▮▮▮▮ and specifically recounted, "I'm struggling with my attendance ▮▮▮▮▮▮▮▮▮▮ Ms. Tjulander's email also described specific symptoms she was experiencing and how they affected her ability to work, including ▮▮▮▮▮▮▮▮▮ which is making it difficult to be at the office at 8:00 am." At another point in the email, Ms. Tjulander explained, "I'm worried I won't be able to come into [*sic*] work tomorrow from ▮▮▮▮▮▮▮▮▮▮▮▮

77.     Ms. Tjulander's April 4, 2023 email reminded Ms. Wright that she (Ms. Tjulander) had previously sought reasonable accommodations, such as the ability to telework, but that Ms. Wright did not grant any accommodations to Ms. Tjulander.

78.     In contrast, Ms. Thompson had been consistently teleworking during the pendency of Ms. Tjulander's employment.

79.     Ms. Tjulander's April 4, 2023 email again requested Defendant to provide her with any forms the Office would need for Ms. Tjulander's medical provider to complete to document her health conditions.

80.     Ms. Wright responded later that afternoon and did not grant Ms. Tjulander an accommodation. Despite the many times Ms. Tjulander had raised her health challenges and

13

their effects on her, Ms. Wright only acknowledged that she knew that Ms. Tjulander was grieving the loss of her stepfather but denied any knowledge that Ms. Tjulander had requsted or was entitled to accommodations related to disabilities. Ms. Wright described the next steps forward as determining "what specific accommodations" Ms. Tjulander was requesting, despite the fact that Ms. Tjulander had already made specific accommodation requests.

81.    Ms. Tjulander responded to Ms. Wright's April 4 email later that day. She explained the history of her raising her health challenges, and the need for accommodations, with Ms. Wright. She explained to Ms. Wright that she did not have to use "magic words" or the word "disability" each time she explained her health struggles to Ms. Wright for the Office to understand she was requesting an accommodation pursuant to the ADA.

82.    Ms. Tjulander's response identified specific accommodations which the Office could provide to her, including being able to make up absences that occurred due to her medical condition; being able to work from home when her medical condition interfered with her ability to report for work in person; a later start time ███████████████ and being excused from a wine tasting event after work hours.  Notably, Ms. Tjulander believed attending a wine tasting event would ████████████████████.

83.    On April 5, 2023, Ms. Wright sought to summarize Ms. Tjulander's most recent accommodations requests and listed: (a) The ability to "make up" absences by working outside of normal business hours; (b) The ability to work from home to make up absences and/or in lieu of using leave; (c) Leave when you are unable to work; (d) An adjustment to your start time from 8:00 a.m. to 9 or 10 a.m.; and (e) Being excused from the wine tasting excursion.

84.     On April 10, 2023, Ms. Wright informed Ms. Tjulander that the Office would be forwarding forms for Ms. Tjulander's health care provider to complete to address Ms. Tjulander's request for accommodations.

85.     After acknowledging Ms. Tjulander's multi-faceted accommodations request, the Office improperly introduced new work requirements in April 2023 for Caseworkers to frustrate Ms. Tjulander's efforts to obtain ADA accommodations.

86.     The Caseworker job description that the Office initially provided to Ms. Tjulander in December 2022 did not include in-person requirements.

87.     On April 13, 2023, Defendant sent to Ms. Tjulander a form for her health care provider to complete as part of the reasonable accommodation process. The form provided by Defendant repeatedly noted new in-person requirements for the Caseworker position.

88.     In an April 10, 2023 email, Ms. Wright said that Defendant would "provide the following interim accommodations on a provisional basis": (a) If Ms. Tjulander was not able to work because of "her condition," she would be granted leave; (b) Defendant would adjust Ms. Tjulander's start time from 8 a.m. to 9 a.m., or later if her "condition" required it; (c) Defendant would advance Ms. Tjulander paid sick leave and annual leave; and (d) Defendant would not require Ms. Tjulander to attend the wine tasting excursion.

89.     Ms. Wright's April 10, 2023 email also stated, "the essential functions of you[r] job . . . include working in-person in the office during regular business hours. As you know, you were hired to be the in-person caseworker for the Portland area office."

90.     Ms. Wright's statements that working in person was an essential function of Ms. Tjulander's job, and that Defendant hired Ms. Tjulander to be "the in-person caseworker" were false.

15

91.    At no time prior to Defendant hiring Ms. Tjulander had Defendant stated that working in person was an essential function of Ms. Tjulander's job or that Ms. Tjulander was hired to be "the in-person caseworker."

92.    Ms. Wright's purported requirements for essential functions for a Caseworker did not apply to Ms. Thompson, who consistently teleworked since beginning her employment as a Caseworker.

93.    Ms. Wright's false statement was made to improperly justify the denial of Ms. Tjulander reasonable accommodations.

94.    It was only after Ms. Tjulander requested a reasonable accommodation under the ADA that Defendant asserted for the first time that working in-person was an essential function of Ms. Tjulander's job and that Ms. Tjulander was hired to be "the in-person caseworker."

95.    Ms. Thompson, the other Caseworker in the district office, held the exact same "Caseworker" position as Ms. Tjulander and performed the same functions as Ms. Tjulander.

96.    The Office permitted Ms. Thompson to work remotely the vast majority of the time during Ms. Tjulander's employment with Defendant.

97.    The only time Ms. Thompson worked in the office was when three other staff members were scheduled to be out of the office at the same time, or, on special occasions, such as the office-wide Open House.

98.    The Office improperly subjected Ms. Tjulander to disparate treatment compared to Ms. Thompson, a similarly situated employee, who did not ask for ADA accommodations.

99.    On April 12, 2023, Defendant held an all-staff meeting as part of the retreat. During the meeting, Rep. Chavez-DeRemer invited the staff to ask her questions, stating, "Ask me anything, even if you think you shouldn't ask it, ask it."

16

100.    After a few questions from other staff members to the Congresswoman, Ms. Tjulander stated that a constituent had asked her if the Congresswoman planned on speaking in the community to address transgender issue in schools, and that she, Ms. Tjulander, did not know what to respond to that question, so she asked if Rep. Chavez-DeRemer would be addressing the issue.

101.    Rep. Chavez-DeRemer replied that she was "not going to be the poster child" on that issue.

102.    During the staff retreat, the staff retreat facilitator asked if there were any in-office processes that the team wanted to discuss to improve. In response, Ms. Tjulander raised her hand and stated, "I'm wondering if there is a more efficient way to assign casework."

103.    Ms. Tjulander asked if there could be a more efficient manner of assigning cases because there were times when cases sat unassigned for up to one week.

104.    Ms. Wright immediately interjected and prevented discussion of this topic.

105.    The staff retreat concluded on April 13, 2023. After the meetings for that day had finished, staff members, as well as Rep. Chavez-DeRemer, discussed whether the whole group would spend social time together. At that point, Ms. Tjulander and Rep. Chavez-DeRemer were the only women present. Rep. Chavez-DeRemer gave Ms. Tjulander a hug, and stated words to the effect of, "I'm going . . . you should too . . . let the guys do their thing."

106.    At no point did Rep. Chavez-DeRemer say or indicate to Ms. Tjulander that she should not have asked the question regarding Rep. Chavez-DeRemer's position regarding transgender students.

17

107.    On April 13, 2023, Ms. Wright sent Ms. Tjulander forms for her medical provider to fill

out in connection with her request for reasonable accommodations under the ADA and requested

Ms. Tjulander return the forms by May 1, 2023.

108.    While completion of the forms was pending, Ms. Wright denied reasonable requests from

Ms. Tjulander to telework in retaliation for Ms. Tjulander's pursuit of her OCWR claim and her

attempts to engage in the ADA accommodations process.

109.    Ms. Tjulander requested to be able to work remotely from California on April 24, 2023.

110.    In denying her remote work request Ms. Wright informed Ms. Tjulander that, "your leave

related to your [medical] condition has cut into your vacation time."

111.    There was no work-related basis for Ms. Wright to deny Ms. Tjulander's request to work

remotely from California on April 24, 2023.

112.    Defendant permitted a number of other staff members to work remotely, including Ms.

Thompson, who was also a Caseworker, but denied Ms. Tjulander the ability to do so.

113.    Prohibiting Ms. Tjulander from working from remotely in this circumstance was a

retaliatory action taken by the Office because Ms. Tjulander rejected the Office's offer to settle

her then-pending OCWR claim, as well as an act of disability discrimination.

114.    On May 1, 2023, Ms. Tjulander submitted to Defendant the disability questionnaire

Defendant requested her healthcare provider to complete. ███████████████████████

███████████████████████  completed and signed the answers to the questionnaire

pertaining to Ms. Tjulander.

115.    In completing the questionnaire, ███████████ noted that: (a) she diagnosed Ms.

Tjulander with ██████████████████████████████████████████████████████

████████████████████████████████████████; (b) Ms. Tjulander ███████████

18

████████████████████████████████ (c) due to Ms. Tjulander's symptoms and

████████████████████████████████████████████████ and

these conditions interfere with carrying out her work duties in person.

116.     ████████ affirmed that Ms. Tjulander's condition rendered her unable to work in the

office at times but that she was able to work from home. She further noted that Ms. Tjulander's

need to work from home could last up to six months, as needed. ████████ further stated

that Ms. Tjulander might need medical leave and that she would need medical care for one year.

She concluded her report by recommending that Ms. Tjulander be provided sick leave days as

needed; flexibility in schedule; time to receive medical care; and the ability to telework when

needed.

117.     Beyond informing Ms. Tjulander that Defendant was reviewing her reasonable

accommodation paperwork, Defendant never responded to Ms. Tjulander's request for

reasonable accommodations, which included, among other options, to telework.

118.     On May 8, 2023, Ms. Tjulander was running late to report to work in-person due to her

medical condition and notified Ms. Wright.

119.     Ms. Wright responded that she was in Washington, D.C. for the week and that Ms.

Tjulander should notify Deputy District Director Alex Lopez that she would be late reporting to

work in-person.

120.     On the morning of May 11, 2023, Ms. Tjulander wrote in a text message to Mr. Lopez

that she was struggling that morning with the symptoms from her condition and needed to

connect with her care provider but otherwise could complete her work remotely. Mr. Lopez

responded thanking Ms. Tjulander for letting him know and asked her to inform Ms. Wright as

well.

121.    Pursuant to Mr. Lopez's instruction to communicate with Ms. Wright as well, Ms. Tjulander communicated with Ms. Wright via text message on May 11, 2023. Ms. Tjulander indicated to Ms. Wright that she was struggling with the symptoms from her condition and needed to work remotely that day. Ms. Tjulander sent the same text message she had sent to Mr. Lopez to Ms. Wright

122.    During the afternoon of May 11, 2023, Ms. Wright responded to Ms. Tjulander's text from earlier that morning. Ms. Wright told Ms. Tjulander that she was not approved for telework.

123.    In response, Ms. Tjulander said that she was confused, as she had submitted the medical documentation Defendant requested, and her medical care provider had stated that she should be able to work from home on some days as needed given her condition.

124.    Ms. Tjulander further texted Ms. Wright that Defendant was discriminating against her, as Defendant had requested the documentation regarding her medical condition and what accommodations were necessary, that she had complied with Defendant's request, but that Defendant was refusing to grant her occasional telework even though she was capable of successfully working remotely.

125.    As Ms. Wright had alerted staff during the previous week that Mr. Lopez was working from home, Ms. Tjulander also asked Mr. Lopez what he had done to receive approval to telework the previous week. Mr. Lopez did not respond to Ms. Tjulander's question.

126.    On the morning of May 12, 2023, Ms. Tjulander woke up ▮▮▮▮▮▮▮▮ as she had still not been provided reasonable accommodations despite submitting the documentation requested by Ms. Wright. She spent the morning suffering ▮▮▮▮▮▮▮ and was unable to report to the office in-person for several hours.

20

127.    Ms. Tjulander arrived in-person to the office after lunchtime to meet with Mr. Lopez.

128.    Ms. Tjulander was visibly upset and asked twice if they could meet in an available private office.

129.    Mr. Lopez insisted they meet in a public space, in front of Colin Swanson, Field Representative, another employee.

130.    During this conversation Ms. Tjulander was compelled to discuss her medical conditions, symptoms, and needs for accommodation with Mr. Lopez in front of Mr. Swanson.  Specifically, Ms. Tjulander explained that she ████████████████████ that morning and pleaded for Mr. Lopez to speak with Ms. Wright to assist Ms. Tjulander to receive the requested accommodations. Ms. Tjulander told Mr. Lopez that it was not fair to her and her colleagues to insist that she come into the office when she was ████████████ as she could complete work from home without exacerbating her condition.

131.    Ms. Tjulander told Mr. Lopez that she had been asking for accommodations for five months and had turned in medical documentation in support of an accommodation that Ms. Wright had requested she submit.

132.    Ms. Tjulander was visibly upset, crying, and humiliated by having to speak with Mr. Lopez, a supervisor, in front of another employee, who was not her supervisor, about her private medical condition and related accommodations request.

133.    Mr. Lopez's conduct in not offering a private and available place to speak upon hearing the disability subject matter of the conversation violated Ms. Tjulander's ADA privacy rights.

**D.    Defendant's Discriminatory and Retaliatory Termination of Ms. Tjulander**

134.    On May 15, 2023, at approximately 2:00 p.m., Ms. Wright asked Ms. Tjulander to meet with her in the office.  When Ms. Tjulander arrived for the meeting, Mr. Han, Chief of Staff, and Ms. Smith, the Scheduler, were present via FaceTime from the Washington, D.C. office.

21

135.    Ms. Tjulander anticipated that this meeting was to discuss her pending requests for a
reasonable accommodation.

136.    Instead, Defendant unlawfully terminated Ms. Tjulander's employment during the
meeting.

137.    Ms. Wright asked Ms. Tjulander if she presently had a second job at a cannabis
dispensary.

138.    When Ms. Tjulander denied having a cannabis industry job, Ms. Wright drew a line on a
pad of paper as if she was crossing off an item in a list.

139.    Asking Ms. Tjulander if she was working in the cannabis industry was made with the
intention of trying to find some fault in Ms. Tjulander's actions or background as pretext for her
ultimate unlawful termination.

140.    Ms. Wright then questioned Ms. Tjulander regarding how she handled a casework call on
May 3, 2023, during the week Ms. Wright was not in the district office.

141.    Ms. Tjulander responded that the May 3, 2023 call involved a legal matter and because
Defendant could not become involved in an individual's legal matter, she had referred the
constituent to other resources.

142.    More specifically, the constituent was required to be listed on the Oregon State Sex
Offender Registry, yet he requested that Congresswoman Chavez-DeRemer assist in removing
his name from the Registry.

143.    After consultation within the office and upon recognizing this was an issue of Oregon
state law (and not federal law), Ms. Tjulander referred the constituent to Legal Aid Services of
Oregon.  In making this referral to the constituent, Ms. Tjulander conferred with Nicole Rucker,
Staff Assistant.

22

144.    Ms. Tjulander also noted that she had entered information into Indigov, the case management system, specifically so that Ms. Wright was aware of what occurred with the constituent's query.

145.    Ms. Wright stated that Ms. Tjulander had acted "unprofessionally or inappropriately" when, during the staff retreat, she asked the Congresswoman about her position regarding transgender students given recent extensive press coverage on these issues and constituent questions. Ms. Wright stated that Congresswoman Chavez-DeRemer was "not happy" that Ms. Tjulander asked her about her policy position on the issue of transgender rights and that because Ms. Tjulander asked the question, the Congresswoman lost confidence in Ms. Tjulander.

146.    Ms. Tjulander responded that Congresswoman Chavez-DeRemer has asked the staff to ask her "any question," and therefore, her (Ms. Tjulander's) question could not be considered "unprofessional" or "inappropriate" in any way.

147.    Ms. Wright criticized Ms. Tjulander for asking about how casework was assigned at the staff retreat. Ms. Wright alleged that Ms. Tjulander was trying to undermine Ms. Wright in front of the staff. Ms. Wright stated "do you think the policy team that handles agriculture and education gives a shit about how we assign cases?"

148.    Ms. Tjulander responded that she was simply concerned with casework being assigned expeditiously and pointed out that she asked the question because the facilitator invited questions about office procedures.

149.    At no point had Defendant provided Ms. Tjulander with any written or verbal protocols regarding the assignment of casework and policies for referring constituents to other resources.

150.    At the meeting, Ms. Wright informed Ms. Tjulander her employment was being terminated for "unprofessionalism" and for "not following office protocols."

23

151. The Office terminated Ms. Tjulander in retaliation for her OCWR Claim.

152. The Office discriminated against Ms. Tjulander by terminating her because she disclosed a disability.

153. The Office terminated Ms. Tjulander in retaliation for Ms. Tjulander seeking reasonable accommodations under the ADA.

154. The Office had a responsibility under the ADA to inform Ms. Tjulander that she was eligible for a reasonable accommodation under the ADA when they became aware of her condition, no later than on or about January 25, 2023.

155. The Office did not inform Ms. Tjulander that she was eligible to request a reasonable accommodation under the ADA until March 29, 2023, after Ms. Tjulander had already told Defendant she became aware she had a right to reasonable accommodations.

156. Defendant never engaged in an interactive process with Ms. Tjulander after she, according to Defendant's instructions, submitted health care provider documentation requesting accommodations.

157. Defendant never granted Ms. Tjulander the reasonable accommodations she requested, or other alternative accommodations consistently when needed.

158. Reasonable accommodations would have allowed Ms. Tjulander to perform the essential functions of her job.

159. Two weeks after Ms. Tjulander submitted medical documentation supporting her reasonable accommodation request, Defendant terminated her employment.

160. Upon information and belief, Ms. Thompson has assumed Ms. Tjulander's job duties since her termination and Ms. Thompson continues to work remotely.

## IV.    CLAIMS FOR RELIEF

### COUNT I
### (Violation of Section 208 of the CAA – 2 U.S.C. §1317)
### Intimidation or Reprisal (Denied Accommodations for Filing OCWR Claim)

161.    Ms. Tjulander incorporates by reference all previous allegations as if fully restated herein.

162.    On or about January 11, 2023, Ms. Tjulander filed a sex discrimination complaint with the OCWR, Case No. 23-HS-01 (CV, FM, FL).

163.    The act of filing a discrimination complaint with OCWR is activity protected from reprisal or retaliation pursuant to Section 208 of the CAA, 2 U.S.C. §1317.

164.    Prohibiting Ms. Tjulander from working from home was an illegal retaliatory action taken by Defendant because Ms. Tjulander rejected Defendant's offer to settle her then-pending OCWR claim as unsatisfactory and continued to pursue her discrimination claim against Defendant.

165.    By prohibiting Ms. Tjulander from working remotely as a reasonable accommodation, Defendant engaged in conduct that would dissuade a reasonable employee from engaging in protected conduct.

166.    As a direct and proximate result of Defendant's conduct, Ms. Tjulander has suffered and will continue to suffer economic and non-economic damages including, but not limited to, the loss of salary and benefits; the loss of other terms, conditions, and privileges of employment; future lost wages; and pain and suffering, inconvenience, mental anguish and loss of enjoyment of life.

167.    As a direct and proximate result of the foregoing, Defendant is liable for economic and non-economic compensatory damages as well as all costs and reasonable attorneys' fees accrued for Ms. Tjulander pursuing her claims under the Act.

## COUNT II
### (Violation of Section 201 of the Act, 2 U.S.C. §1311 (Americans with Disabilities Act and Rehabilitation Act) – Failure to Accommodate

168.    Ms. Tjulander incorporates by reference all previous allegations as if fully restated herein.

169.    At all times relevant to this claim, Ms. Tjulander suffered from a disability within the meaning of the ADA and the Rehabilitation Act of 1973.

170.    Ms. Tjulander is a qualified individual with a disability, capable of performing the essential functions of her job with or without reasonable accommodation, within the meaning of the ADA.

171.    Defendant was aware of Ms. Tjulander's disability at all relevant times.

172.    Ms. Tjulander requested reasonable accommodations numerous times during her employment with Defendant.

173.    Ms. Tjulander requested, as one accommodation, that she be able to telework when her health conditions interfered with or prevented her from going to the office.

174.    Defendant's knowledge of Ms. Tjulander's disability and her requests for an accommodation are evident as described above, including, but not limited to, what occurred in January 2023 through May 2023.

175.    On May 1, 2023, Ms. Tjulander provided Defendant with the medical documentation requested by Defendant.  This documentation described her disability and need for reasonable accommodations, including that she be able to telework when her health conditions interfered with or prevented her from going into the office.

176.    Telework was a reasonable accommodation. Defendant's caseworkers consistently demonstrated that casework was successfully performed remotely.

177.    Ms. Tjulander's colleague, Ms. Thompson, the other Caseworker in the district office, teleworked the vast majority of the time that Defendant employed Ms. Tjulander.

178.    At times Defendant permitted other district office employees, including Mr. Lopez, to telework.

179.    Beyond informing Ms. Tjulander that Defendant was reviewing her reasonable accommodation paperwork, Defendant never responded to Ms. Tjulander after she submitted the medical documentation Defendant requested her to submit. Defendant did not grant or explicitly deny the request. Nor did Defendant offer any alternatives to Ms. Tjulander's reasonable accomodation request.

180.    Defendant violated Ms. Tjulander's rights under the ADA when it refused to engage in the interactive process to identify a reasonable accommodation for Ms. Tjulander.

181.    Defendant violated Ms. Tjulander's rights under the ADA when it refused to grant her any reasonable accommodation.

182.    A reasonable accommodation would have allowed Ms. Tjulander to perform the essential functions of her job. Ms. Tjulander's requested accommodations would not have imposed a significant difficulty, expense, or any undue hardship on Defendant.

183.    As a direct and proximate result of the Defendant's conduct, Ms. Tjulander has suffered and will continue to suffer economic and non-economic damages including, but not limited to, the loss of salary and benefits; the loss of other terms, conditions, and privileges of employment; future lost wages; pain and suffering, inconvenience, mental anguish and loss of enjoyment of life.

184.    As a direct and proximate result of the foregoing, Defendant is liable for economic and non-economic compensatory damages as well as all costs and reasonable attorneys' fees accrued for Ms. Tjulander pursuing her claims under the Act.

## COUNT III
### (Violation of Section 201 of the Act, 2 U.S.C. §1311 (Americans with Disabilities Act and Rehabilitation Act) – Failure to Maintain Confidentiality of Medical Information

185.    Ms. Tjulander incorporates by reference all previous allegations as if fully restated herein.

186.    Section 201 of the Act, 2 U.S.C. §1311, incorporates the provisions of the Americans With Disabilities Act and Rehabilitation Act.  42 U.S.C. § 12112(d)(4)(C) requires employers to treat any medical information obtained from a disability-related inquiry, as well as any medical information voluntarily disclosed by an employee, as confidential.

187.    Mr. Lopez's requirement of Ms. Tjulander to openly discuss her medical diagnosis, symptoms, and needs for reasonable accommodation in the presence of Mr. Swanson violated Ms. Tjulander's ADA privacy rights.

188.    As a direct and proximate result of the Defendant's conduct, Ms. Tjulander has suffered and will continue to suffer economic and non-economic damages including, but not limited to pain and suffering, inconvenience, mental anguish and loss of enjoyment of life.

189.    As a direct and proximate result of the foregoing, Defendant is liable for economic and non-economic compensatory damages as well as all costs and reasonable attorneys' fees accrued for Ms. Tjulander pursuing her claims under the Act.

## COUNT IV
### (Violation of Section 208 of the CAA – 2 U.S.C. §1317)
### Intimidation or Reprisal (Termination for Requesting Reasonable Accommodations)

190.    Ms. Tjulander incorporates by reference all previous allegations as if fully restated herein.

191.    Numerous times throughout Ms. Tjulander's employment with Defendant, she made Defendant aware of her disability and requested reasonable accommodations pursuant to the ADA.

192.    On April 13, 2023, Ms. Wright sent Ms. Tjulander forms for her medical provider to fill out in connection with her request for reasonable accommodations under the ADA.

193.    Pursuant to Ms. Wright's instructions, Ms. Tjulander had her health care provider complete a disability questionnaire which documented Ms. Tjulander's medical conditions. The health care provider recommended a limited number of workplace adjustments, including telework, when necessary, as reasonable accommodations for Ms. Tjulander.

194.    Beyond informing Ms. Tjulander that Defendant was reviewing her reasonable accommodation paperwork, Defendant was unresponsive to Ms. Tjulander after she submitted the medical documentation Defendant requested her to submit.

195.    On May 15, 2023, Ms. Wright asked Ms. Tjulander to meet with her in the office.

196.    Defendant terminated Ms. Tjulander's employment for reasons that were pretextual.

197.    Two weeks after Ms. Tjulander submitted this documentation, Defendant terminated her employment.

198.    By terminating Ms. Tjulander's employment on May 15, 2023, Defendant engaged in conduct that would dissuade a reasonable employee from engaging in protected activity.

199.    There is a causal link that connects the statutorily protected activity by Ms. Tjulander with the termination of Ms. Tjulander's employment by Defendant. Defendant terminated Ms.

Tjulander's employment a mere two weeks after she submitted reasonable accommodation paperwork.

200.    Defendant fired Ms. Tjulander because she is an individual with a disclosed disability, who requested reasonable accommodations under the ADA.

201.    Defendant's firing of Ms. Tjulander was an illegal act in retaliation for requesting accommodations under the ADA.

202.    As a direct and proximate result of Defendant's conduct, Ms. Tjulander has suffered and will continue to suffer economic and non-economic damages including, but not limited to, the loss of salary and benefits, including Defendant's repayment of Ms. Tjulander's student loans; the loss of other terms, conditions, and privileges of employment; future lost wages; pain and suffering, inconvenience, mental anguish and loss of enjoyment of life.

203.    As a direct and proximate result of the foregoing, Defendant is liable for economic and non-economic compensatory damages as well as all costs and reasonable attorneys' fees accrued for Ms. Tjulander pursuing her claims under the Act.

## COUNT V
### (Violation of Section 208 of the CAA – 2 U.S.C. §1317)
### Retaliation or Reprisal (Termination for Filing OCWR Claim)

204.    Ms. Tjulander incorporates by reference all previous allegations as if fully restated herein.

205.    On or about January 11, 2023, Ms. Tjulander filed a discrimination claim with OCWR.

206.    The act of filing a discrimination claim with OCWR is activity protected from reprisal or retaliation pursuant to Section 208 of the CAA, 2 U.S.C. §1317.

207.    On March 15, 2023, Ms. Tjulander and Defendant attempted to settle Ms. Tjulander's then-pending discrimination claim through mediation.

208.    Ms. Tjulander rejected Defendant's offer to settle her discrimination claim as

unsatisfactory, and Ms. Tjulander continued to pursue her discrimination claim.

209.    After Ms. Tjulander rejected the Defendant's offer to settle her discrimination claim, Ms.

Wright's entire demeanor and actions towards Ms. Tjulander changed.

210.    Ms. Wright began retaliating against Ms. Tjulander. This retaliation included, but is not

limited to, that: Defendant prohibited Ms. Tjulander from teleworking; Ms. Wright admonished

Ms. Tjulander for taking initiative in her work duties; and on May 15, 2023, Ms. Wright

terminated her employment.

211.    There is a causal link that connects the statutorily protected activity by Ms. Tjulander

with the termination of Ms. Tjulander's employment by Defendant.

212.    The reasons Defendant provided Ms. Tjulander for her dismissal were pretextual.

213.    Defendant fired Ms. Tjulander because she filed a sex discrimination claim with OCWR

and then refused Defendant's offer to settle that claim.

214.    Defendant's firing of Ms. Tjulander was an illegal act in retaliation for pursuing a

discrimination claim with OCWR.

215.    By terminating Ms. Tjulander's employment on May 15, 2023, Defendant engaged in

conduct that would dissuade a reasonable worker from engaging in protected activity.

216.    As a direct and proximate result of Defendant's conduct, Ms. Tjulander has suffered and

will continue to suffer economic and non-economic damages including, but not limited to, the

loss of salary and benefits, including Defendant's student loan repayment of Ms. Tjulander's

student loans; the loss of other terms, conditions, and privileges of employment; future lost

wages; pain and suffering, inconvenience, mental anguish and loss of enjoyment of life.

31

217. As a further direct and proximate result of the foregoing, Defendant is liable for economic and non-economic compensatory damages as well as all costs and reasonable attorneys' fees incurred by Ms. Tjulander to pursue her claims under the Act.

## COUNT VI
### (Violation of Section 208 of the CAA – 2 U.S.C. §1317)
### Intimidation or Reprisal (Termination for Engaging in Protected Activity Opposing Discriminatory Practices)

218. Ms. Tjulander incorporates by reference all previous allegations as if fully restated herein.

219. Despite Ms. Tjulander's repeated attempts to obtain a reasonable accommodation, Defendant never provided one to her.

220. Beyond informing Ms. Tjulander that Defendant was reviewing her reasonable accommodation paperwork, Defendant never responded to Ms. Tjulander after she submitted the medical documentation Defendant requested her to submit.

221. Between May 1 and May 15, 2023, Ms. Tjulander requested to be able to telework when her health condition interfered with her ability to go to the office.

222. Defendant denied her requests to telework during this period of time.

223. On May 11, 2023, Ms. Tjulander wrote in a text message to Ms. Wright that she was struggling that morning with symptoms related to her health condition and needed to connect with her medical care provider but could complete work remotely.

224. Ms. Wright responded that Ms. Tjulander was not approved for telework.

225. Ms. Tjulander responded that she was confused, as she had submitted the medical documentation Defendant requested, and her medical care provider had stated that she should be able to work from home some days.

226.    Ms. Tjulander further wrote that Defendant was discriminating against her. Ms. Tjulander stated that Defendant had requested the documentation regarding her medical condition and what accommodations were necessary, that she had complied with Defendant's request, but that Defendant was refusing to grant her occasional telework even though she was capable of successfully working remotely.

227.    Ms. Tjulander inquired why Mr. Lopez, the Deputy District Director, and Ms. Thompson, the other Caseworker, were permitted to telework.

228.    Ms. Wright did not provide any response to Ms. Tjulander's question about the bases on which her two colleagues were permitted to work remotely.

229.    Ms. Tjulander's May 11, 2023, complaint that Defendant was discriminating against her based on her disability constituted protected activity under the CAA.

230.    Only four days after Ms. Tjulander complained of discrimination, Defendant terminated Ms. Tjulander's employment.

231.    Defendant's May 15, 2023 termination of Ms. Tjulander's employment was an illegal act in retaliation for her May 11, 2023 complaint about discrimination.

232.    As a direct and proximate result of Defendant's conduct, Ms. Tjulander has suffered and will continue to suffer economic and non-economic damages including, but not limited to, the loss of salary and benefits, including Defendant's repayment of Ms. Tjulander's student loans; the loss of other terms, conditions, and privileges of employment; future lost wages; pain and suffering, inconvenience, mental anguish and loss of enjoyment of life.

233.    As a direct and proximate result of the foregoing, Defendant is liable for economic and non-economic compensatory damages as well as all costs and reasonable attorneys' fees accrued for Ms. Tjulander pursuing her claims under the Act.

33

**COUNT VII**
**(Violation of Section 201 of the CAA – 2 U.S.C. §1311)**
**Prohibited Discriminatory Practice (Termination Based on Disability Discrimination)**

234.    Ms. Tjulander incorporates by reference all previous allegations as if fully restated herein.

235.    Ms. Tjulander has been diagnosed with ███████████████████████████

██████████████████████████

236.    Ms. Tjulander's ███████████ substantially limited several of her major life activities, including but not limited to, █████████████████████████ Due to Ms. Tjulander's symptoms and ███████████████████████████ █████████████; and these conditions interfere with carrying out her work duties as well as other daily tasks.

237.    Ms. Tjulander had the requisite skill, experience, education, and other job-related requirements to fulfill the qualifications as a caseworker within Defendant's office.

238.    Ms. Tjulander was able to perform the essential functions of the position of caseworker for Defendant's office with or without reasonable accommodation.

239.    Despite Ms. Tjulander's repeated attempts to obtain a reasonable accommodation, Defendant never provided one.

240.    Beyond informing Ms. Tjulander that Defendant was reviewing her reasonable accommodation paperwork, Defendant never responded to Ms. Tjulander after she submitted the medical documentation required by Defendant.

241.    Defendant was aware of Ms. Tjulander's disability at the time of her termination from employment on May 15, 2023.

242.   Defendant's proffered reasons for terminating Ms. Tjulander's employment are factually untrue, held Ms. Tjulander to a higher standard than other similarly situated employees, and otherwise constitute pretext for her unlawful termination.

243.   Ms. Tjulander was unlawfully discharged from her employment with Defendant on May 15, 2023 because she had a disability.

244.   As a direct and proximate result of Defendant's conduct, Ms. Tjulander has suffered and will continue to suffer economic and non-economic damages including, but not limited to, the loss of salary and benefits, including the Defendant's repayment of Ms. Tjulander's student loans; the loss of other terms, conditions, and privileges of employment; future lost wages; pain and suffering, inconvenience, mental anguish and loss of enjoyment of life.

245.   As a direct and proximate result of the foregoing, Defendant is liable for economic and non-economic compensatory damages as well as all costs and reasonable attorneys' fees accrued for Ms. Tjulander pursuing her claims under the Act.

## COUNT VIII
### Violation of Section 201 of the CAA – 2 U.S.C. §1311;
### Prohibited Discriminatory Practice (Disparate Treatment Based on Disability Discrimination)

246.   Ms. Tjulander incorporates by reference all previous allegations as if fully restated herein.

247.   Ms. Tjulander has been diagnosed with ███████████████████████

████████████████

248.   Ms. Tjulander's ███████████ substantially limited several of her major life activities, including but not limited to, ███████████████████ Due to Ms. Tjulander's symptoms and ████████████████████

35

███████████████████ and these conditions interfere with carrying out her work duties as well as other daily tasks.

249.    Ms. Tjulander had the requisite skill, experience, education, and other job-related requirements to fulfill the qualifications as a caseworker within Defendant's office.

250.    Ms. Tjulander was able to perform the essential functions of the position of caseworker for Defendant's office with or without reasonable accommodation.

251.    Despite Ms. Tjulander's repeated attempts to obtain a reasonable accommodation, Defendant never provided one to her.

252.    Beyond informing Ms. Tjulander that Defendant was reviewing her reasonable accommodation paperwork, Defendant never responded to Ms. Tjulander after she submitted the medical documentation Defendant requested her to submit.

253.    Between May 1 and May 15, 2023, Ms. Tjulander requested to be able to telework when her health condition interfered with her ability to go to the office.

254.    Defendant denied her requests to telework during this period of time.

255.    Mr. Lopez, the Deputy District Director, and Ms. Thompson, the other Caseworker, were permitted to telework.

256.    Defendant was aware of Ms. Tjulander's disability at the time denied her requests to telework.

257.    Defendant did not provide Ms. Tjulander with a reason for the denial of her telework requests.

258.    As a direct and proximate result of Defendant's conduct, Ms. Tjulander has suffered and will continue to suffer economic and non-economic damages including, but not limited to, the

loss of other terms, conditions, and privileges of employment; pain and suffering, inconvenience, mental anguish and loss of enjoyment of life.

259.    As a direct and proximate result of the foregoing, Defendant is liable for economic and non-economic compensatory damages as well as all costs and reasonable attorneys' fees incurred by Ms. Tjulander to pursue her claims under the Act.

## V.    PRAYER FOR RELIEF

WHEREFORE Claimant Jennifer Tjulander seeks judgment against Defendant on all claims and prays this Court:

a) award her lost wages, employment benefits, and other compensation lost by Ms. Tjulander from the date of her unlawful termination until the time of hearing or trial by reason of Defendant's violations of the CAA;

b) award her lost wages, employment benefits, and other compensation that Ms. Tjulander will continue to lose from the time of hearing or trial into the future by reason of Defendant's violations of the CAA;

c) award her equitable relief of reinstatement retroactive to the date of her termination of employment, or in the alternative award her front pay;

d) expunge any adverse materials relating to her unlawful termination from the Defendant's records;

e) award her pre- and post-judgment interest, as applicable, on the amounts described in clauses (a)-(b) calculated at the prevailing rate;

f) award her damages for pain, suffering, physical and mental injury, emotional distress, reputational harm, harm to her credit rating, costs related to seeking new employment,

37

inconvenience, mental anguish and loss of enjoyment of life, past and future, resulting from Defendant's violations of the CAA;

g)  award her attorney's fees and other litigation expenses and costs, as applicable;

h)  grant relief to compensate Plaintiff for increased tax liability due to any award recovered as a result of this complaint;

i)  order all employees in Defendant's office to complete trainings offered by the Office of Congressional Workplace Rights and the Office of Employee Assistance on the Americans with Disabilities Act in the workplace;

j)  and order such other and further relief, in law or equity, as may be deemed appropriate and just.

## PLAINTIFF DEMANDS A TRIAL BY JURY

January 18, 2024

Respectfully Submitted

Kevin L. Owen, DMD 16693
(*pro hac vice*)
Gilbert Employment Law, P.C.
8403 Colesville Road, Suite 1000
Silver Spring, MD 20910
Kowen-efile@GELawyer.com
Tel:    (301) 608-0880
Fax:    (301) 608-0881

Beth Creighton, OSB 972440
beth@civilrightspdx.com
CREIGHTON & ROSE, PC
The Strowbridge Building
735 1st Ave., Suite 300
Portland, OR 97204
Tel:    (503) 221-1792
Fax:    (503) 223-1516

**For Plaintiff**